STATE OF NEBRASKA, APPELLEE, V. RAYMOND TULLY, APPELLANT.
413 N.W.2d 910

Filed October 16, 1987. No. 86-1106.

John F. Sheaff and Roy A. Sheaff of Sheaff Law Offices, for appellant.

Robert M. Spire, Attorney General, and Jill Gradwohl Schroeder, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

On February 9, 1962, defendant-appellant, Raymond Tully, pled guilty to second degree murder and was thereafter, on February 14, 1962, sentenced to life imprisonment. More than 24 years later, on June 5, 1986, he filed a motion for postconviction relief pursuant to the provisions of Neb. Rev. Stat. §§ 29-3001 et seq. (Reissue 1985). Following an evidentiary hearing, the motion was denied. In this appeal Tully urges that the district court erred in failing to overturn his conviction because (1) his plea was accepted without amendment to the information charging him with first degree murder, (2) his plea was not made knowingly, intelligently, and voluntarily, (3) he was not competent to plead, and (4) there was

no presentence investigation or other determination of his background prior to imposing sentence. We affirm.

The record reflects that the information charged Tully with first degree murder, alleging that he "feloniously, purposely, and of his deliberate and premeditated malice" killed his father. At the arraignment Tully's attorney advised the judge and prosecutor that his client was willing "to enter a plea of guilty to second degree murder." In response to a question by the judge, Tully said he understood. A series of questions between Tully and his attorney establishes that he and Tully had discussed the possibility of standing trial on the charge of first degree murder or of pleading guilty to a charge of second degree murder and that the attorney had explained the penalties for each offense to Tully. In response to the judge's inquiry Tully's attorney said he had no doubt Tully was then sane and was so at the time of the crime.

Psychiatric reports entered in evidence at that hearing establish that Tully told an examining psychiatrist that he had confessed killing his father to the authorities and that he had been having arguments with his father over a period of 2 years, hated him, and had purchased a rifle some 2 weeks prior to the shooting should his father make him "mad enough to use it." On the day of the shooting, Tully and his father, while working together all day, had argued over a number of things, including Tully's previously undisclosed membership in a flying club. During these arguments, the father had threatened to smash the club's plane. After they quit working, Tully had dinner with his parents, and later left to run errands. At the conclusion of his errands, Tully picked up the rifle, which he had hidden in an empty house, arrived back home at about "1:30 P.M. [sic]," cut the telephone wires, and shot his father in the head. Tully then "ditched" the rifle in a nearby vacant house. According to Tully, he was still angry, particularly over his father's threat to damage the plane, as Tully had always had an interest in flying, to the displeasure of his father. Tully, who was then 36 years old, later stated that at the time of the shooting he was so confused that he did not know the difference between right and wrong.

Tully had quit school when he was 16 years old and had finished the eighth grade. The examining psychiatrist

concluded Tully was mildly mentally retarded, having a measured intelligence quotient of 81. He had "many schizoid features" and partially "disassociated" while under stress. In this examiner's opinion it was "entirely possible" that Tully was not responsible for short periods of time while under stress and that there was "a reasonable doubt" as to whether Tully could "be classified as being sane at the time that he became involved with the shooting of his father."

Upon the prosecutor's statement that he had no objection, the judge accepted Tully's plea to second degree murder. The information was not amended at any time.

The prosecutor told the judge that Tully had no prior criminal record of consequence, the only thing being that Tully and another man once broke some windows at a pool hall. The judge deferred sentencing for 5 days, saying he wanted to visit with Tully in the presence of his attorney and the prosecutor. The record does not reflect what was said during that visit, if it took place.

When asked at the sentencing hearing whether Tully had anything to say as to "why sentence should not be pronounced," his attorney replied that "defendant has no statement to make."

We begin by noting that the merits of Tully's assignments of error are, in general, to be determined by the law as it existed when his plea was accepted. *State v. Bevins*, 187 Neb. 785, 194 N.W.2d 181 (1972).

Tully's first assignment of error rests upon the premise that the failure to amend the information constituted reversible error per se. Tully has failed to cite us to any authority in support of this premise; indeed, quite the contrary is true. In *Moore v. State*, 148 Neb. 747, 29 N.W.2d 366 (1947), an appeal from a conviction under Neb. Rev. Stat. § 28-402 (1943), we held that if the information charged murder in the first degree, a conviction of murder in the second degree could be sustained. Later, *Wolff v. State*, 172 Neb. 65, 108 N.W.2d 410 (1961), taught that a plea of guilty accepted by the court is a conviction or the equivalent of a conviction of the highest order, and its effect is to authorize the imposition of the sentence prescribed by law. Reading *Moore* and *Wolff* together, we learn that under

the law as it existed in 1962, a plea of guilty to second degree murder was properly entered in response to the information, which had charged first degree murder.

Tully next assigns as error the more general complaint that the trial court's failure to amend the information before accepting his guilty plea constituted a "failure to inform him of the nature and elements of the offense with which he was charged and . . . failure to assure that [his] guilty plea was voluntary." Brief for Appellant at 5. We will treat these two aspects of Tully's second assignment of error individually.

Tully's first contention has no merit under the law as it existed in 1962. The relevant homicide statutes in effect at the time were Neb. Rev. Stat. §§ 28-401 and 28-402 (Reissue 1956), which read in relevant part as follows:

> 28-401. . . . Whoever shall purposely and of deliberate and premeditated malice . . . kill another . . . shall be deemed guilty of murder in the first degree, and upon conviction thereof shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury.

> 28-402. . . . Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another . . . shall be deemed guilty of murder in the second degree; and upon conviction thereof shall be imprisoned in the penitentiary not less than ten years, or during life.

A comparison of the foregoing language reveals that, but for the fact that second degree murder does not require deliberation and premeditation as does first degree murder, the elements of the two crimes are identical. Tully does not claim that he did not know the elements of first degree murder. As *Moore v. State, supra,* points out, the previously cited statutes define degrees of the single crime of homicide. The unlawful killing constitutes the principal fact, and the condition of the mind or the attendant circumstances determine the degree or grade of the offense. When the greater degree has been committed, the lesser has also been committed, the lesser necessarily having been involved as a constituent part of the greater. Therefore, evidence which proves first degree murder proves the existence

of second degree murder. Thus, while it would certainly have been better procedure to have amended the complaint, it cannot be said that Tully suffered any prejudice by being permitted to plead guilty to a lesser degree of the crime charged in the information. This assignment of error is thus resolved by the rule that error without prejudice does not provide a ground for the reversal of a criminal conviction. *Svehla v. State*, 168 Neb. 553, 96 N.W.2d 649 (1959).

Tully next argues that the failure to amend the information renders his guilty plea involuntary, and therefore void, under *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), which holds that the waiver of federal constitutional rights cannot be presumed from a silent record; in order for a plea of guilty to stand, it must not only have been intelligently and voluntarily entered, but the record must affirmatively disclose it to have been such.

Tully acknowledges, however, that the principles enunciated in *Boykin* apply prospectively and not retroactively. *Brown v. Swenson*, 487 F.2d 1236 (8th Cir. 1973); *Rinehart v. Brewer*, 561 F.2d 126 (8th Cir. 1977). In *Brown*, the circuit court specifically held the *Boykin* requirements did not apply to a plea entered in 1964 and that the determinative question was whether under the totality of the circumstances the pre-*Boykin* plea was entered knowingly and voluntarily. See, also, *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).

This court announced the procedures to be used in accepting pleas of guilty in *State v. Turner*, 186 Neb. 424, 183 N.W.2d 763 (1971). *State v. Tweedy*, 209 Neb. 649, 309 N.W.2d 94 (1981), extended the *Boykin-Turner* rule for prospective application to all offenses for which a defendant may be imprisoned, be they felonies, misdemeanors, or traffic infractions. The procedure for taking guilty pleas was clarified further in *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986), and now requires that in order to support a finding that a plea of guilty has been freely, intelligently, voluntarily, and understandingly entered, the record must show that the court (1) informed the defendant concerning (a) the nature of the charge, (b) the right to assistance of counsel, (c) the right to confront witnesses against the defendant, (d) the right to a jury trial, and (e) the privilege

against self-incrimination; and (2) examined the defendant to determine that he or she understood the foregoing. Additionally, the record must establish that (1) there is a factual basis for the plea and (2) the defendant knew the range of penalties for the crime with which he or she is charged.

Thus, while the plea might not pass constitutional muster today, a matter we do not decide, the question is whether under the totality of the circumstances it can be said the plea was knowingly and voluntarily entered under the law as it existed in 1962. The record tells us Tully was represented by counsel, a factual basis for the plea existed, he had confessed to killing his father, he had been told the penalty for second degree murder as well as for the greater crime with which he was charged, and he himself told the judge he understood he was pleading guilty to the lesser offense. Tully had sufficient information to understand that by pleading guilty to second degree murder he removed the risk of being sentenced to death for the killing. Under those circumstances, we conclude that if Tully was competent to plead, the plea was a knowing and voluntary one.

This brings us to Tully's third assignment, wherein he urges there was error in failing to find he was not competent to enter a plea of guilty.

The present law is that a defendant is competent to plead or stand trial if he has the capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and to make a rational defense. The issue of competency is one of fact to be determined by the trial court, and the means used to resolve it are discretionary with the court. Mental retardation does not necessarily imply incompetence to plead or stand trial. *State v. Bradford*, 223 Neb. 908, 395 N.W.2d 495 (1986). The determination of the trial court on the issue of a defendant's competency to enter a plea of guilty will not be set aside on appeal if there is sufficient evidence to support such finding. *State v. Davis*, 224 Neb. 771, 401 N.W.2d 165 (1987).

We have neither been referred to nor found any Nebraska law to suggest that the rules were otherwise when Tully entered his plea. We therefore apply the foregoing rules to the plea before us and conclude that the exchanges between Tully and

the judge in accepting his plea, coupled with the court's observation of Tully's exchanges with his attorney, are sufficient to support the trial court's implicit finding that Tully was competent to plead.

In his final assignment Tully claims the trial court erred in failing to order a presentence investigation or to otherwise adequately inform itself about his background.

At the time of Tully's conviction Neb. Rev. Stat. § 29-2217 (Reissue 1956) provided:

> In all cases of criminal prosecution, whenever any person shall have been found guilty, by verdict of a jury, or by his plea of guilty duly entered in the cause, of any misdemeanor or any felony, *except murder, treason, or forcible rape*, it shall be the duty of the court in which such cause is pending to ascertain, if practicable, through the agency of a probation officer or otherwise, the age of the accused, whether the offense of which he is found guilty by such verdict is his first offense, the extent of the moral turpitude involved in the act committed by the accused, and such other facts and circumstances relating to the accused as he may desire to know.

(Emphasis supplied.) Clearly, this statute imposed no duty on the court to investigate prior to announcing sentence, as the crime to which Tully had pled guilty was specifically exempted from its embrace.

The level of Tully's education and intelligence and the fact that he had no past criminal record were known by the court. Tully does not tell us what additional information helpful to him any further investigation of his background would have revealed. This assignment is therefore controlled by the rule that one seeking postconviction relief bears the burden of establishing the basis for such relief. *State v. Rubek*, 225 Neb. 477, 406 N.W.2d 130 (1987). No such basis has been established.

There being no merit to Tully's assignments of error, the judgment of the district court denying postconviction relief is affirmed.

AFFIRMED.